CHRISTOFF v CITY OF GLADSTONE

1. EQUITY—APPEAL AND ERROR—DE NOVO REVIEW.
   The Court of Appeals reviews equitable actions de novo, but a trial court's opinion is accorded great weight.

2. MUNICIPAL CORPORATIONS—TAXES—SPECIAL ASSESSMENTS—FIRE PROTECTION.
   Increased fire protection to residents of a city is a benefit sufficient to support a special tax assessment.

3. ESTOPPEL—ESTOPPEL IN PAIS—WORDS AND PHRASES.
   The concept of the doctrine of estoppel in pais is fraud, actual or constructive, on the part of the person sought to be estopped and arises when a person, by his acts, representations or admissions, or by his silence when he should speak, intentionally or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the person inducing the belief is permitted to deny the existence of those facts; thus, there can be no estoppel unless one is misled to his prejudice by the acts of another against whom the estoppel is set up.

4. ESTOPPEL—EQUITABLE ESTOPPEL—APPLICABILITY OF DOCTRINE.
   The doctrine of equitable estoppel is not applicable where there is no proof that the person setting up a claim of estoppel was induced by a misrepresentation to do what he otherwise would not have done.

Appeal from Delta, Bernard H. Davidson, J. Submitted October 14, 1975, at Marquette. (Docket No. 23469.) Decided November 14, 1975.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error §§ 703, 822.
[2] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 133.
[3] 28 Am Jur 2d, Estoppel and Waiver §§ 1, 4, 27.
[4] 28 Am Jur 2d, Estoppel and Waiver § 26 *et seq.*

Complaint by Wayne and Claire J. Christoff, Donald J. and Johanna Cretens, and others against the City of Gladstone, Gladstone City Commission, Honorable Raymond Morton, mayor, and Douglas Bovin, Paul J. Cowen, Anthony Marmalick, William A. Smith, members of the Gladstone City Commission, Ronald Willmes, city assessor, Howard W. Keeton, city manager and clerk, jointly and severally for an injunction prohibiting the levy of a special assessment for the laying of water mains. Injunction denied. Plaintiffs Phillip and Geneva Cretens, Robert and Joyce Heynssens, James and Alberta LaLonde, and Edlore and Isabelle Patient appeal. Affirmed.

*Nino E. Green* (by *Frederick C. Weisse)*, for plaintiffs Cretens, Heynssens, LaLonde and Patient.

*Strom, Butch, Quinn & Rosemurgy,* for defendants.

Before: ALLEN, P. J., and DANHOF and M. F. CAVANAGH, JJ.

ALLEN, P. J. This is an appeal by four of eleven property owners in the city of Gladstone whose complaint for a permanent injunction prohibiting the levy of a special assessment for the laying of water mains was denied by the trial court. Plaintiffs' properties are situated along Lowrie Avenue which runs parallel to and some distance back of a high bluff overlooking Lake Michigan. Plaintiffs constructed residences on their property, three of which set back from Lowrie Avenue some 400 feet, and the fourth 650 feet from the street. As there was no available city water in the bluff area, all plaintiffs, prior to construction, drilled their own

wells at an average cost of approximately $1,472.00. Sometime in 1970, funds became available to the city from the Department of Housing and Urban Development to pay 50% of the cost of the water main extension. The remaining 50%, less a small portion financed by a transfer to the general fund from the municipal electric utility, was assessed against property owners at $4.50 a foot multiplied by the number of feet of property abutting on Lowrie Avenue. The city's charter permits special assessments on property "specially benefited".

In a meticulously prepared written opinion the trial judge rejected plaintiffs' claim that they derived no special benefit from the proposed special assessment. Specifically, the trial court found that plaintiffs were benefited by increased fire protection, an assured safe water supply, and by some increase in the market value of their property. Though we review equitable actions *de novo,* the trial court's opinion is accorded great weight. *Davis v Bridgeport Township Planning Commission,* 55 Mich App 15, 16; 222 NW2d 13 (1974). Our review of the record testimony and exhibits uncovers nothing to justify our departure from the findings of the trial court. Increased fire protection will be provided because the hoses of the fire engines can run off the proposed water main rather than returning the fire trucks to the foot of the hill to refill the tanks.[1] Increased fire protection in itself is a benefit sufficient to support a

---

[1] The city has two fire trucks, one holding 750 gallons of water and the other 500 gallons. The discharge rate in a typical residential fire is 200 gallons per minute. Thus "it would take one truck about 3-1/2 minutes to empty and the other one about 2-1/2 minutes to empty" after which the trucks would have to go down to the bottom of the hill, fill up again at the hydrant and come back. With the proposed new water mains the normal pumping capacity would be 500 gallons per minute and the trucks would pump continuously. (Tr, p 51–52).

special assessment. *Johnson v City of Inkster,* 56
Mich App 581, 588; 224 NW2d 664 (1974). To
overcome the court's finding with respect to fire
protection benefits, plaintiffs point out that the
proposed system does not have "a firm capacity"[2]
of 500 gallons per minute as recommended by the
consulting firm retained by the city to develop the
system, and as initially required by the Michigan
Department of Public Health. Trial testimony
shows, however, that the Department of Health
modified its requirements and approved installa-
tion with a firm capacity of 300 gallons per minute
for the reason that while the system was designed
to ultimately accommodate a much larger popula-
tion, in the first years of operation the total resi-
dential load would be light, and the prospect of
any unit being out of service during the initial
period would be extremely low. Moreover, even a
300 gallon per minute firm capacity off the pro-
posed water main would be a substantial improve-
ment over the existing system of trucking down
the hill to fetch another pail of water.

Since plaintiffs maintained their own water sup-
ply system from wells sunk on their property, the
benefits to them are, of course, less direct. Never-
theless, benefits would accrue if the bluff resi-
dences were to connect to the new mains on Low-
rie Avenue. City water in the area to be served,
unlike well water, is floridated for dental health.
Further, while water from private wells is only
occasionally tested by the property owner, city
water is tested daily by the city, and periodically
by the state. Owing to the tendency of private

---

[2] Final plans called for two 200 gallon per minute pumps and one
100 gallon per minute pump. Normal capacity is the sum total of all
three pumps, *viz:* 500 gallons per minute. "Firm capacity" is the sum
of all three pumps minus the largest unit, *viz:* 300 gallons per minute.
It is the system's capacity assuming that the largest unit is out of
service for repairs or any other reason.

wells to become contaminated as population increases, the water mains assure a more safe water supply. Finally, granted the increase is smaller when the property has its own source of water, the record indicates that property values do increase where city water is made available.

Plaintiffs claim the lower court erroneously failed to invoke equitable estoppel against defendant. The doctrine of equitable estoppel is aptly summarized in 11 Michigan Law & Practice, Estoppel, § 8, pp 70–71:

"The concept of the doctrine of estoppel in pais is fraud, actual or constructive, on the part of the person sought to be estopped, and arises when a person, by his acts, representations or admissions, or by his silence when he should speak, intentionally or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the person inducing the belief is permitted to deny the existence of those facts. Thus, there can be no estoppel unless one is misled to his prejudice by the acts of another against whom the estoppel is set up."

Plaintiffs state that although the city commenced plans for a water main extension to the bluff area in 1967, plaintiffs were advised that city water would not be so extended as late as 1972. Plaintiffs' position is that this misinformation caused them to construct wells that they would not have otherwise done. Interrogatories, stipulated to as part of the record, disclose that two of the plaintiffs (Patient and Heynssens) stated they did not contact the city prior to drilling their wells. A third plaintiff (Cretens) installed his well in 1965— a date prior to the earliest date claimed as the time when the city first seriously considered water

main extension.[3] It is thus evident that the doctrine of equitable estoppel has no applicability to these plaintiffs.

Plaintiff LaLonde drilled his well in 1968 after requesting water from the former city manager who responded "there were no plans of installing water mains on the Bluff in the near future". Moreover, the city manager reportedly informed LaLonde that city water would not be available in his area for "at least 25 years". The record indicates that when the city manager made the statement, the city was in fact unable to proceed owing to lack of funding for the 50% share which the city would pay. The funds were not available from the Department of Housing and Urban Development until about 1970, and application therefor was not made until 1971. On May 29, 1973, the city learned it could use approximately $96,000 from the municipal utility surplus fund for the water main project, and it was not until September 1973, that the city council set a public hearing on the proposed assessment. Based on these facts, it seems the city manager's statement in 1968 that water would not be available "in the near future" was not misleading, but accurate. Although the opinion relative to 25 years appears farfetched in retrospect, no evidence exists that the manager did not sincerely believe it, or that LaLonde would have deferred drilling for five years had the city manager possessed the clairvoyance to say water would be available in September 1973. In short, there is no proof in the record that LaLonde was induced to do what he otherwise would not have done because of a misrepresentation of facts by

---

[3] On February 8, 1967, the city received an engineering report from Northern Michigan Engineers for the cost of extending water along 29th Street with "provisions * * * to allow *future* installation * * * along Lowrie Avenue * * * ".

defendant. *Holt v Stofflet,* 338 Mich 115; 61 NW2d 28 (1953). For these reasons, *Geftos v Lincoln Park,* 39 Mich App 644; 198 NW2d 169 (1972), cited by appellants as sole authority for the applicability of equitable estoppel, is clearly distinguishable.

Affirmed, no costs, a public question being involved.